We will hear arguments first in No. 23-1260, Hachette Book Group v. Internet Archive. Mr. Gratz. Good morning, Your Honors, and may it please the Court. I'm Joe Gratz with Morrison & Forster for Internet Archive. This case asks whether it is unlawful for a library to lend a book it has bought and paid for to one patron at a time as libraries have always done. And the answer is no. Libraries have never had to pay publishers to lend the books they own. And that result should not change with the advent of digital technology, so long as only one patron at a time can still check out that particular copy. Well, if the forms are considered distinct things and there are separate markets for them, why shouldn't the law recognize that converting the paper book into a digital book isn't just the same thing as passing around the paper book? Your Honor, the use of digital technology to do something more efficiently, to do the same thing more efficiently, is something that the courts recognize as something that is justified under fair use. That is, for example, what is going on in the Sony case, where there is a different form that is more convenient using technology, but that conversion is justified because it serves the purposes of copyright. But we don't say in Sony that the reason why it's transformative is because of the digital form. We say it's because of the time-shifting element, which is different from the original one. And it's not true that that is the core of fair use that might be at the margins. But I guess my question is, didn't we say in Google Books that just converting a book into a digitized form is not transformative? What this court said in Google Books was that if what Google had been doing, instead of making snippets available to everyone in the world at once, was making the entire book available to everyone in the world at once, that that would be a tough fair use case. I mean, that's right. So we would not have said that if Google Books were just allowing one person at a time to look at the entire book? That would be a very different set of facts in every fair use case. But didn't we say it wasn't transformative, that just converting a book into a more convenient form is not transformative? So just on the first factor, maybe other factors point in a different direction, but just on the first factor, doesn't it suggest that the conversion doesn't make it transformative? So two points on that, Your Honor. The first is that in TDIs and revisions, this court characterized converting something, using digital technology in a different form, taking a broadcast and turning it into a digital transmission, is a form of transformativeness. But the second thing I want to say about that, Your Honor, is in Warhol, in particular, the court divides this up and says, look, there are lots of different ways to be justified under the first factor. Some of them are differences in purpose, and some of them are justified for other reasons. And this is, at the very least, even if you don't find it transformative, a use that is justified for those other reasons. And the justification here, as in Sony, is that you're just doing something you could do otherwise. They could hand the book to the patron. They could mail the book to the patron. That patron is entitled to read that book, just as that person was entitled to watch that television program in Sony. In the real world, there's a lot more friction in the sort of market for passing a paper book from one person to another. And I'm imagining that that's priced into the price of the paper book. Your premise is that a scanned digital version of that paper book is nothing more, is tantamount to the same thing as the book. But we know there's a distinct market for those digital books. They're priced separately. So you're taking something from one market, and you're inserting it into another market without ever having paid the premium in that new market. So two responses, Your Honor. The first is, the flip side of friction is added utility and convenience. And this court says, and in Sony and this court case interpreting it, that increased convenience and efficiency of distribution, that is, the flip side of friction, is something that is favored under the first factor. It's good if we are increasing efficiency and reducing friction. But the other response, Your Honor, is that's why it is so important to us that the data about what this does, in fact, in the real world, shows that there is not an effect on the market, either for digital lending by libraries through OverDrive or any other market. Well, getting to that point of whether there is, I believe you're alluding to the fourth factor, I noticed in your brief you have this sentence, Internet archives policy is not to lend books published within the past five years because book sales generally peak within the first years of publication. Isn't that a recognition or an admission that you recognize that there's value in the electronic version of books and that you would not lend them without paying and that that would be an impact on the market? No, Your Honor. Why not? And the answer is the five-year sort of delayed window is intended to be prophylactic. That is, it is ensuring that there is... Prophylactic of what? Against any concern that there would be a commercial impact. So you acknowledge that within five years of publication of a book or the release of a book, that you're copying a book, that you either get donated to you or somehow obtain. Most of these you weren't buying. You certainly weren't buying the e-book license. You do acknowledge that copying the books and creating a digital format of the book and then lending it would have an impact on sales. Two answers, Your Honor. First, I don't necessarily, and my answer to that is no. The five-year rule is there in order to ensure that the publisher's concerns that they have stated on that, which they state here today, are addressed. Which is that sales generally peak within the first years of publication. And our response to that concern, which we do not think is well-founded, Your Honor, is, okay, we won't lend during the first five years. But that was your policy from day one, right? That's right. Before the lawsuit. That is why we have been doing it without molestation by the publishers since 2011. But is there a condition that you could lend it out during the first five years and that would still be fair use? That would be a different case, Your Honor. And I think the answer to that is yes. If you're just doing it in your discretion. So the answer to that is we think that would be fair use, Your Honor, because we don't think that would have a market effect either. If they could show there was or if the facts were different, that's why fair use is case by case. And if there were a case presenting those different facts, that might be different. Is the burden on them to show that there is market impact versus on you to show there's not? The burden on the fourth factor ultimately rests on us, and we have amply met it by coming forward with this evidence of a lack of market harm in response to which they have come forward with no evidence whatsoever and just supposition. So I guess my answer is it certainly doesn't matter where the burden lies, and I acknowledge that courts have said different things about where the burden lies, but even if the burden lies entirely on us, we have amply met it. But how the district court assessed that evidence, Dr. Jorgensen's expert opinion and the second doctor's expert opinion, with regard to Jorgensen, the concern is that the focus was just on the current impact or impact within a limited time period. Do you acknowledge that in addressing the fourth factor, one of the things courts can consider is not just current impact but future impact? I agree that is what courts consider, but that is what Dr. Jorgensen was considering as well. And this is, I think, the important part that the district court didn't appreciate about Dr. Jorgensen's analysis. Dr. Jorgensen was analyzing not just has this had an effect right now at a smaller scale, but was assessing would this have an effect, were it, as the publishers say they are afraid of, were it to scale up with lots and lots of libraries doing it. Your position is even if it is totally pervasive, your library lending program, it would never have an economic impact on the market for either e-books or physical books? Yes, Your Honor, because there are natural limits. It does seem like it is a replacement for it, so why just intuitively would that be the case? For the same reason that the fact that there are 9,000 public libraries out there that are lending out these books right now does not have that impact, or at least it would not have a differential impact. Well, don't they have a limit? Those libraries are subject to, it is not CDL, but something equivalent to it, and they purchase those e-book licenses, correct? Well, and I am comparing... I think that is the difference here. You didn't buy this. I am comparing the situation, Your Honor, not to the overdrive licenses, but to the physical copies they own. This is what is important about the scaling up question. For CDL to scale up, there needs to be a copy that is bought and paid for from the publisher. Libraries are not using technology like Scribe to turn hard copy books into e-books. They are purchasing e-licenses, correct? That is the big difference. Well, many libraries are using CDL and things that are in many ways like CDL to serve their purposes, and that is discussed in a number of the amicus briefs. The hypothetical that is posed by the publishers is, what if all of the 9,000 public libraries joined in and started doing CDL? Wouldn't that have a market effect? And the answer is, those libraries have copies right now on paper that they are lending out, and they would presumably either have to buy more copies, which would redound the benefit of publishers on paper for this purpose, or they would need to not physically lend those copies in order to lend them digitally. That is the premise of digit. Well, yes, there is a statutory carve-out for libraries, right? Congress made clear that there is an authorization for libraries to lend out the books. Isn't it totally obvious that if Congress didn't provide that carve-out that what libraries were doing, even if they scaled up, would fall under fair use? Is Your Honor talking about if the libraries were lending? Well, part of your argument is just analogous to what libraries are doing with physical works, and therefore we shouldn't treat it as the non-fair use. But you have to rely on the idea that it's fair use, because there isn't a statutory carve-out for the CDL program. But the libraries can point to a statute that says, Congress said regardless of what fair use allows, there's an authorization for us to lend out our books. I don't know if we apply the fair use factors to somebody who just launched a library in the absence of that statutory authorization that it necessarily would say, you're allowed to lend out all these books. So I'm asking, is it clear that it would? So your premise is the libraries show that this is a fair use, and we're just taking it one step further. But do the libraries show that? Because Congress thought it was necessary to lay out that they have a specific authorization. Well, and let me answer that this way, which is to say, the libraries are clearly permitted under the law to lend out their physical books physically. Wait, but that's because Congress has the statute that says so. Section 109 says anyone, a librarian or not, can lend out a physical object physically. The question is, if you are doing the exact same thing with the exact same physical object, the same book that they've authorized. But you're not doing the exact same thing. So that statute, Section 109, talks about you can lend out the physical copy, but then it also specifically delineates when you can make a copy of it, or a digital copy, and it limits when you can distribute that. So why wouldn't it conflict with what Congress has specified to say, well, this is really just the same as the physical copy? Congress addressed the question of creating a copy of the physical copy, right? Well, the answer to what Congress thought should happen here is in 108F4, where Congress says nothing in Section 108 shall affect fair use, right? This is not intended. Right, so what I'm saying is you are relying on just the application of the fair use factors, whereas libraries don't have to do that. Libraries can rely on the first sale doctrine and what's laid out in Section 109. Physical lending does not require fair use. That's right. And the only reason we are talking about fair use is because the technical process Right, but you're saying we're doing exactly what libraries are doing, but actually it's a totally different legal framework. There's a first sale doctrine for the physical copies, and then what you want to do is based on the fair use factors, which is a different section of the statute and a different legal text. We don't actually know if in the absence of the first sale doctrine whether a library would meet the fair use factors. Well, Your Honor, the role that fair use plays here is as a gap filler because we are moving from doing the same thing in a way that doesn't make copies, which we can do as a library, to doing the same thing in a way that does involve the making of copies. It is exactly like Sony in that way, that move, that is doing something that does not require copies, watching TV when it's on. You're shifting to something that does require making copies simply as a technical and incidental matter that doesn't change the substance of what's going on. In Sony the difference was that there's a one-time broadcast and the transformative thing is that you have time shifting. Here the difference is not time shifting, because you can always read books at your convenience, so the difference is you can read it on an e-reader as opposed to carrying around a physical copy. That's the transformative character of it. That is what rendered it justified. You are doing the same thing using technology in a more efficient or, as Sony says, more convenient way. Footnote 40. So under factor four you say that actually there's one reason there's supposed to be a market for e-books is because e-books are more attractive than digitized versions of physical books, right? They're more user-friendly or whatever. So what that kind of means is what you're saying is that your digital copies are more convenient or more attractive, or more convenient than physical books, but less convenient than e-books, and so they kind of stand in between physical books and e-books. But in fact, if your product stands in between two available products for which there is a market, doesn't that tell us both that you must be interfering with a market, and second, that it can't really be transformative because it's a kind of middle position between two products that are protected by copyrights. So the same is true of any situation in which there is a use that is justified, or this court called it transformative, where technology is being used to increase the efficiency or convenience of delivery. And as to the question whether there is a market harm for that, that is differential from what we as a library would otherwise be doing with that physical copy. That is where the evidence lies. Counsel, I'm trying to help me understand how I can reconcile two statements that you've made on the record. One is even if 9,000 libraries joined the Open Libraries Project, there would be no impact on the e-book market for the publishers. That's your position. Yet, when it came to the Rule 56-1 statement, there was evidence submitted that you did not dispute that when pitching to libraries to join the Open Libraries Project, your CEO said, you want to do this because you don't want to have to buy it again. You can have your patrons access all of these books free of cost. We can share catalogs. How do you jive those two? They don't seem to... If your pitch to libraries is join us and you get all these books for free, how does that reconcile with, hey, but we're going to have no impact on the e-book market? The pitch is not join us and you will get these books for free. The pitch is you have a collection of physical materials that you have developed over time, and you can lend it to your patrons. This is a way for you to lend your books. I get that. But when they buy those books, they buy the physical copies to lend to their patrons one at a time or through an interlibrary change, but they also buy e-books to make those available to their patrons. We're focused here on e-books and impacting e-licensing. I have a hard time reconciling those two, specifically as to e-licensing. Why would libraries ever pay for an e-license if they could have Internet Archive scan all the books, hard copies they buy and make them available on an unlimited basis? Because Overdrive, the e-licenses, don't require those books to be in their physical collection. They don't have to go out and buy the book. They don't have to store the book. They don't have to catalog the book. That's just sort of, they're paying for rent. Wait, aren't they limited in terms of either the e-license, as I understood it, the e-licenses are either you get to use it for a period of time or a limited period of time, hence the pitch, you don't have to buy the content over and over again, or a number of uses, whether it's 100, 50, however that is. So, it's not exactly that once you buy an e-book license, you get that book forever and unlimited, is it? I mean, they also have the, I forget the acronym, but the digital management registration that controls, which it seems similar to CDL in a way. So, Your Honor, you are right that the license terms that the publishers offer to libraries do not allow them to have electronic materials in their permanent collection, which is these libraries have print materials in their permanent collection, and if they want to use CDL as an alternative to rental, right, the overdrive scenario, they need to buy those books, they need to store those physical books in order to have copies, physical copies, that can support those digital ends. So, to answer Your Honor's question, why would any library ever pay for overdrive if CDL existed? The answer is those libraries, in order to use CDL, need to purchase and maintain physical books supporting those... But isn't it generally the case that the library will have a physical copy and then also wants a digital copy? So, if they already have a physical copy and they want to circulate this digital copy now, you know, in the absence of your program, they would have to license an e-book. But once the program is available, they don't need to and they can just digitize, or rely on you to digitize the physical book they have, right? This offers them another way of using the access they've already got, the right they already have to lend it to one patron at a time, in exactly the same way that the VCR and Sony allow the person to access the material later instead of right now. So, Judge Barnes was saying the library now buys physical copies as well as e-books. But, you know, one other point is that the publishers produce both physical copies and e-books, right? So, you're saying that your product is transformative as compared to the physical books, but if we think of the copyright as adhering in the literary work that is produced both in a physical copy and in an e-book, does your product still look transformative as compared to the e-book version that the publishers are producing? Our claim is not that mirror format shifting is transformative. Our claim is that this use, like in Sony and TDI, and the re-digitalized on TDI, is transformative or otherwise justified in the same way that the use in Sony was. Right, so you're saying it's transformative because it is a use of the physical book. If it were a use of the e-book, that you just kind of rejiggered the e-book format and produced it in your format, you would say it's not transformative. But because you can act on the physical book as opposed to the e-book, you're saying it's a fair use of the physical book. And if that's true, then maybe, you know, your argument that it doesn't even matter if it interferes with the market for e-books because we're just saying we can make fair use of the physical books. Well, and let me separate out two things, Your Honor. The question of what is the purpose and is that a justified purpose and is increasing the utility of a copy that's already out there or someone's access to a copy that's already out there, as in Sony and TDI, is that a justification? Is that a first factor question? And, okay, let's say that's a justification. What's the effect on the market? And how should we think about that in opposition to this purpose? Right, so you're saying that we shouldn't think about e-books when thinking about whether it's transformative, but we should think about them in terms of the market impact. I think you have to think about them in terms of the market impact because the plaintiff has told you to, right? And we've shown why there isn't a market impact there. With respect to why this use is justified, under the first factor... If your first factor analysis relies on distinguishing between the e-books and the physical books and saying it's a fair use of the physical book, even if it wouldn't be a fair use of the e-book, why wouldn't you say, well, all the factors should focus on the comparison of our product versus the physical book? This is exactly what the plaintiff said and what's going on in Sony as well. They said, look, you don't need to tape these movies off the air. We'll rent you a tape. We'll sell you a tape. You can get those benefits this other way just by paying us. You shouldn't be able to use technology yourself because you already have to get those benefits. That is the same thing that's going on here. We are using technology in order to get that benefit. But doesn't the argument you just said imply that it actually doesn't matter if it has an impact on that other market? Because you can use technology on the physical book and like in Sony, it wouldn't matter if it has impact on video rentals. And why wouldn't you say, our position is that it wouldn't matter even if it had an impact on e-books? Two answers, Your Honor. The first is, I think there is a separation between, is this an efficiency-enhancing purpose that is aiding the copyright law's purpose of the creation and dissemination of knowledge versus what's the effect on the market, right? That's important too. We need to talk about that. The other thing, but those are, I think, separate factors that all go into this stew that get considered together in light of the purposes of copyright. But the second thing I'll say is, I think even in articulating why even in gloss on Sony, TBI says, well, it's gotta be a situation where there isn't a significant effect on the rights of the market. And what she said about that is, the reason it wasn't is, it was to someone who already had an entitlement to receive that content because they could have put up an antenna just as clear as someone who's entitled to receive the content because it's the one person who checked out the book. Just in the moment, the purpose of the creation and dissemination of knowledge. But you would acknowledge you're not creating knowledge, you're just increasing the dissemination of it, right? Because you are copying the book. The purpose for which we are doing this is to aid in the creation and dissemination of knowledge. Sony wasn't either, right? But the court said that that was part of their... But it's not just positive. But the purpose of the analysis, you're not doing anything, you're not adding to the artistic work, you're just making it more easily accessible. Two answers, Your Honor. First, we actually are, in parts of our functionality, plaintiffs aren't, wisely, aren't challenging. Like the Wikipedia links, where people are able to... Yeah, but the way that works is like snippet view, right? You can click on it and go to the particular part of the book. But if you want the whole book, you have to do it through CDL. Again, you're talking about... It's not really part of CDL, the Wikipedia links, right? So they rely on CDL so they can find them, but yes, the other place... Well, just like in Google Books, they have digitized all the books, they could just make the full text of all of them available, and we said that that might be a problem, but the snippet view is something different. I agree, but that is the distinction, that is the distinction, and here the distinction is, it's not that something is being made available to everyone in the world at once, as in Google Books, it is being made available to the one person who checked out the library. And on the topic of how this aids in scholarship and in the creation of knowledge, in addition to simply its determination, I would point, Your Honors, to the Authors Alliance brief in particular, where there are scholars talking about the importance of this for their scholarly work. How does the capital records... I understand all the one person at a time, but isn't that exactly the argument for rejecting the capital records case, where they said, no, we're not letting you copy your digital file and reproduce it, we're letting you lose your own access to it in favor of someone else gaining access to it, and we rejected that. So, I agree, Your Honor, that the re-digit case was not a finding of fair use, and that case is different from this one along a number of axes. The most important, I think, is that it was commercial from the point of view of the service and commercial from the point of view of the user, where this is non-commercial from the point of view of the user. But we said it wasn't transformative. We didn't rely on the commercial nature. We said, this isn't transformative, this provides a market for resale of digital files, which is kind of what you're saying is this provides a way to utilize the physical books one at a time that otherwise might be sitting on a shelf by making them available one at a time to anybody anywhere in the country, in the world, who wants them. Well, and the difference, Your Honor, is we are relying on an analogy to, and in fact, we are simply engaging in, library lending that otherwise could take place and otherwise would take place with respect to a particular physical copy. With constraints that impact the value of the library's ability to do that that are very much tied to the physical instantiation of the book, right? That's right. You can't rely on that one book to serve the serial needs of people globally because the cost of sending the book would exceed the cost of just getting another book on the other side of the world. I don't think I agree with that, Your Honor, and I don't think the record supports it. Libraries do lots of things with books, right? Libraries do interlibrary loans. Libraries send books all over the world. And that is because when a library has bought a book, there is a limitation on what the library can do. The library has to keep and store the book, and that costs money, and the library can only check it out to one person at a time. And that is us. And if they want to check it out to more people at a time, they need to buy more copies. And that is exactly why what we are doing is simply lending out the physical object by different means, whereas what was going on in Redigi was far more ethereal, which led to the court saying, you know what, this is actually just a download site. I don't see this as meaningfully analogous. Of course, it wasn't just a download site because it forced the transferor of the digital file to sever their access to that file, and the technology purportedly ensured that they wouldn't be able to ever use it again. If they had a physical phonographic record or a CD or something like that from the golden days, they would have been able to go to a record store and sell it as a used record. And this was nothing more than a perfect analogy to that in the new digital era, and the court said no. But what's important, I think, is the Redigi case itself acknowledges that using technology to make delivery more efficient is a justification. In that case, it was not a sufficient justification because of commerciality, because of a lot of other issues that are not present here. So let me just ask, I mean, we have said, I think on multiple occasions we've described the recast, and I'm looking at one case of recasting of a novel as an e-book, as paradigmatic derivative work to which the author would have the rights rather than a transformative work. I take it we have to either say we were wrong, overrule that, or maybe declare it dicta, I don't know. In order to embrace your position, we'd have to reject that contention. No, Your Honor. What Your Honors need to do, I think, is understand that in opposition to, or in the context of, the way the Supreme Court talks about these issues in the Warhol case, which is looking not at whether the thing itself is itself transformative, but instead looking to whether the purpose for which the thing itself is being used is a different, non-substituted purpose, or whether there is some other justification for the use. That, in particular, the place they lay that out most clearly is in footnote 8 in Warhol. Oh, come on. In Warhol, you have a photograph, and then Andy Warhol does a painting, which you'd think adds a lot of creative, something extra to the photograph, and the Supreme Court says, well, you know, they're all just pictures. They appear in the cover of a magazine. It's all really the same purpose. So that's what the Supreme Court does in Warhol, where we would think that there's a lot of creative activity going on in the purported fair use. If you're just digitizing the book, shouldn't we say, well, look, it's just to let people read the book, and so it's really the same purpose. In Warhol, they were saying, look, we are using this for the same purpose, but we have done a physical transformation. We have not made it transformative purpose. It's just illustrating a magazine article about Warhol, but because of our physical transformation, that renders it transformative. What the court said is, you need to look at the use and the purpose of the use and ask whether it's the same purpose or where the purpose is related, as, for example, in Google Oracle, whether the use is otherwise justified, and there is ample justification, both in Oracle Google, and in this case, for why, even though there isn't a physical transformation of the content. The use in this way is justified as serving the purpose of the copyright because we are doing the same thing to the same person that we could do. We just don't have to pay the person. But you haven't... Go ahead. You have not addressed the National Emergency Library. That's been sort of silent today. So, given your statement now, you would agree that the National Emergency Library was a violation of copyright because it wasn't one-to-one, correct? I was not... I mean, you were allowing multiple users to use the same digital copy of a hard book. The National Emergency Library does present different facts and different justifications, Your Honor. The justification in that circumstance is not primarily that there was a technical control, as there is in CDL, making sure that only there was a matched physical copy, but instead the justification that there was a global pandemic and all of the libraries were closed. And so no one could access any of the books in any of the libraries during that particular period. And doing the NEL today, I think I am sort of... I am trying to say that would be a substantially less justification. Oh, you're not even willing to say that that would be okay? That that would not be okay under copyright? You're saying that if your client engaged in a program similar to NEL, that would not violate copyright? If they did that outside of the National Emergency, I don't think that would be likely to be found to be fair use, Your Honor. That's not my question. My question is, would you agree? Would you be willing to concede today that that would be a copyright violation? If they were to do the NEL today, would that be a copyright violation? I don't think that would be a very strong fair use case, but I don't think that would be a very strong fair use case, Your Honor. And the reason for that is, the justification for the NEL... No, I understand the justification and your argument. I'm trying to understand, where does it end? Where's the slippery slope? Because, you know, you may be saying that today and tomorrow come in and say, well, but now we found another use, which, you know, the one-to-one doesn't really... We're not limited to the one-to-one lending under CDL. This is why it's so important that courts consider fair use and Congress has instructed courts to consider fair use on a case-by-case basis. When I... In many cases, you'll hear a counselor, well, that would be a different case, Your Honor. In fair use, that really matters because everything goes into the stew. And I don't think that's a stew that would be fair use in a situation where you just... That would be precisely the hypothetical in Google Books, which this court has said would be a strong claim. Right? That would be very different from what is presented to the court here. And so all this court needs to decide is whether with these limits as to these works that were all available electronically, right, these 127 works, as to these limits on these facts, whether this is fair use or not. This court should find that it is because... So we don't have to decide whether the... CDL is also a fair use, right? That's also before us. So is your argument for why it's a fair use because given that the libraries were closed, your unlimited lending of the digital version is a kind of rough approximation of the number of physical copies that might be out there? Or is the argument that in a world in which the physical libraries were closed, all bets are off and we can just kind of lend as many digital copies as people want to read? So I think the answer is those are both available... Those are both justifications for the NAL. First... What's the one that you think is right? So the one that I think is right is it was a global pandemic. All the libraries were closed. We have never seen that before and I hope we will never see it again. And under those particular circumstances, lifting the lending caps while keeping an eye on what was going on was justified. I think one can also look at it and say, you know what? I actually want to know numerically what happened, right? I want to have a sense that this wasn't just a free-for-all that actually sort of caused people to be able to read these books who wouldn't have been able to read these books in the world where all the libraries were open. And that's why we offer the analysis that says, well look, the highest lending cap for any book was whatever, the Lion, the Witch, and the Wardrobe at this particular time on this particular day and it doesn't come anywhere near the number of copies in libraries that were closed. It's not in itself an independent sort of... It's a reason not to be worried about the consequences of the argument that goes in the unique circumstance where all of the libraries are closed. Yeah, I get it. I think I have that argument. Okay, Mr. Roth, you reserve time for rebuttal so we'll hear from you again. But let's turn to the affilee of Ms. McNamara. Thank you. Good morning, Your Honors. Elizabeth McNamara for affilees. May it please the Court. I want to start by reframing and step back to really focus on the practical realities of what Internet Archive is doing and what is before this Court. Internet Archive is asking this Court to disregard the controlling law of this Court as well as the Supreme Court and what it is seeking is a radical change in the law that if accepted would destabilize the digital economy. Not just for books but for movies, for music, for TV and the like. Without license or payment Internet Archive is making a complete, exact digital copy of the publisher's print book and distributing them around the world so that they can be read. The exact same purpose for which the publishers are publishing these works. Can I ask, we had a lot of analogies to interlibrary loan and things that libraries already do with their books. In your view, is the interlibrary loan practice that's common throughout, does that rely on fair use? Does that rely on the first sale doctrine and statutory authorization specifically for that? I think it relies entirely on the first sale doctrine,  under Section 109 as authorized by Congress. You are still distributing the physical copy of the book. And as Your Honor recognized, there's a lot of friction involved with distribution of physical copies that is significantly different than what is capable with digital copies. That's why they are two independent markets with very distinct capabilities and the law and the digital economy with books as everything else turns on the fact, very key principles, that the copyright owner owns the right to distribute their works in different formats and to distribute them under the terms for which they deem to be appropriate. But IA simply usurps those rights and offers a direct substitute for the publisher's e-book. That's a more basic question. So if Congress had not codified the first sale doctrine and didn't have Section 109 that authorizes libraries, if libraries only had to rely on the fair use doctrine, would it be obvious that you could do whatever you want with a physical book? Would libraries fall under fair use if we didn't have the first sale doctrine and the statute? Yes, I think it would, Your Honor. I think the Supreme Court, the physical book, the Supreme Court has recognized that you have an unlimited right to distribute physical books. It's not simply because it was codified in Section 109. And what's happening here If that's just a fair use to do whatever you want once you purchase the physical book, why can't I make a copy of it? Because you are changing it into a different format which is an entirely different market. You are doing what this Court has repeatedly said is not fair use. You are repackaging and republishing the work in a different format. Hottie Treff said that. Infinity versus Kirkwood said that. That is the law of this circuit. There is nothing If you're repackaging but you're redistributing it only on a one-to-one basis. So let's say a library's physical copy gets damaged. I think that there's an objection that that is a circumstance in which a library can scan the book and make a digital copy. There are very limited circumstances under Section 108 which allows libraries to make copies. One is for preservation. One is the circumstance Your Honor is alluding to. So what was not recognized in the argument you just heard is that the Copyright Office and Congress over the last decade has repeatedly been approached to say you need to think about the digital economy. You need to think about digital works. You need to think about the first sale doctrine and whether that should apply in the digital world. And they have consistently rejected the changes to the law both by the Copyright Office as well as Congress. And one of our amici briefs from the very legislators who were involved in that established that this is an entirely different market. And what underscores that this is a different market Your Honor is that 93% of public libraries license e-books. And those licensed e-books are already being distributed to hundreds of millions of users around the world. You said a moment ago that the first sale doctrine would be justified by fair use even in the absence of express statutory authorization. But you just now pointed to the limited authorization of libraries to create digital copies as a reason why companies shouldn't be able to do so now. But if you already recognize that the fair use kind of operates independently what is the role of that statute that limits when the library can generate digital copies? Isn't the question here that we should just decide whether this particular use of a digital copy is a fair use? Or does the fact that Congress delineated circumstances under which digital copies could be made does that limit what we should read into the other parts of the statute? Well, this court in Bertucci said the latter,  It looked at that very question. It looked at the provisions under the Copyright Act and said that those issues have been considered by the legislature as well as the Copyright Office and chose to not change... So then your argument actually is that, yeah, okay, there's a statute that talks about fair use but there's a more specific statute that says when libraries can digitize books and that should control the fair use statute. Correct, Your Honor. That should control. And that's what was decided by this court. They said that if you want to change the law, your job is to go to Congress. We're not in the position to change the statute. Well, just in terms of what the statute says, the statute says, okay, you can do whatever you want with a physical book but you can only create a digital copy for archival purposes or other limited purposes but you're allowed to distribute it. Correct, Your Honor. It does not envision in any way the practices of internet archives which is digitizing literally millions of copies of books and making them available around the world to users. This is not... Your argument actually would be before we even get to the fair use factors, we should just say that Congress has resolved the question on when libraries can digitize books. Right? Is that your... I think that fair use generally acts as an overlay so one does need to consider the fair use factors and as the court did below, I'm not sure that I would go so far as to say this has just been precisely resolved by section 108. I think 108 dictates that it would not allow such a thing that it would be contrary to the provisions of the statute but then we look at fair use and we analyze fair use and the factors and as found below... It would be a weird result if the fair use section of the statute somehow nullified or overrode the digital copy section of the statute. So would it be a contradiction if we decided that Internet Archive is right that the fair use statute authorizes this use but it's not consistent with the library digitization section of the statute? I think that's... I mean that's an interesting question here, Honor. I don't think it really would be... If it still serves the purposes under the Supreme Court, if this served a different purpose under Warhol, which is the central question and clearly here the precise same purpose is being used here. They're creating these digital works in order to have them read by their users. That is the exact same... So you're saying it's not transformative if it doesn't meet the fair use factors. If I was curious if we thought it did meet the fair use factors, might that still not be an available argument even if there's a separate section that specifically addresses digitization by libraries or digitized copy by libraries? Well, I think that... Are you suggesting that they do kind of operate independently but we should be more wary of that deciding it's a fair use because of the specific statute not necessarily that it controls... I think that's correct, Your Honor. It seems to be what you're saying. I think that's correct. And I... Oh, I'm sorry. No, I was... Were you going to... No, no. Go ahead. All right. So the common sense inference that these digitized books are competing in some sense in an existing market or in a potential market is very strong. I think the court recognized that. One of the things I'm struggling with a little bit having read the public resource ASTM versus public resource decision from the D.C. Circuit is that there was a similarly arguably compelling inference to be drawn there. The industry standard books which get sold and help fund the organization that put out those standards were being put online for free. And that would support the evidence that that's going to cut into their sales. And the D.C. Circuit said, Well, not so fast. We still need to go through the process of actually presenting evidence and evaluating that evidence to determine market impact. We can't simply assume that that must be the case because our intuition tells us that. Why isn't that also true here? For two reasons,  First of all, with the ASTM case that you're referencing, it's important to underscore that what drove that case was that these standards had been enacted into law. When the standards were not enacted into law, the D.C. Circuit held that was not a fair use. They didn't need any further evidence. They didn't need anything. It was, if so facto, not a fair use. Here, clearly, Catcher in the Rye has not been implemented into law as a standard on how a teenage boy should operate. And so I think that, and you could say that about virtually every work that is at issue here. So ASTM is completely inappropriate. And in fact, it supports our position. But more to Your Honor's point about the market harm and whether there needs to be further evidence, I want to underscore a couple of points. First, the standard is not whether actual harm has occurred already. The standard is whether the actions, if unrestricted and widespread, would act as harm. And as this court underscored in TBI, I think, or rather, the harm... Well, the program told us what is necessary is a showing by preponderance of the evidence that some meaningful likelihood of future harm exists. If the intended use is for commercial gain, that likelihood may be presumed. But if it is for a noncommercial purpose, the likelihood must be demonstrated. I know you have an argument about commercial purpose, but assuming we think it's a noncommercial purpose, hasn't the Supreme Court said that even for likelihood of future harm, you need some kind of demonstration of the market harm? You can't just rely on speculation, right? And we're not relying on speculation. Okay, but what's the evidence? What's the demonstration that we think the Supreme Court said we need to have? The demonstration is twofold, Your Honor. We have two avenues. First of all, and I think this is important to focus on, is that this Court in Warhol in analyzing the fourth factor said that there is an usurpation of the market when the infringer's target audience and the nature of the work are the same. That is precisely the situation here. We have the same target audience, people to read e-books. We have the exact same content. I mean, do we know that? Is that totally clear? I mean, so, you know, if you're time-shift videos, it might be that some people watch it at the broadcast and other people watch it at the time-shifted time. It might be that digitizing the books means you're reaching a whole new audience. Why isn't that an also inference that's possible from the record? Well, that really goes to the first factor and the efficiencies, Your Honor. That isn't the market issue, which I'm happy to address. Let me answer your question. You keep talking about whether it's targeting the same audience and I'm saying, well, it's not totally obvious to me that it is targeting the same audience so I sort of want to know how I know that it is. Well, it's targeting the same audience because the audience is readers, the specific audience are readers who want to read books and check them out from libraries. That's the exact same audience. That is our market. That is, we're making, there are hundreds of millions of dollars being paid in license fees by libraries across the country. So, if you think about the e-books that are licensed to the library, then it really is the same audience because you could have somebody who was renting an e-book from a library or somebody who was renting the CDL version of the book from the same library. Exactly. It's the same content and it's the same audience. And you mentioned two, you mentioned two things you would point to to show that it's been established here that it would have an impact on the future market, e-book market for publishers. What's the second thing? Okay, well, the first thing is lost licensing fees. That is a stipulated fact in this record. It is not disputed that Internet Archive refuses to pay the standard license fees being paid by libraries. Well, I actually have a follow-up question. I have a question on that. There was something in their brief that I read that they tried to purchase an e-book licensing and they were told by one of the publishers not all publishers that are part of the group that they could not enter into an e-licensing. And I'm not sure if I'm going outside of the record, but they certainly made the reference to that. Can you respond to that? Yes, Your Honor. The only way that IA has entertained licensing is to not get a license. They want to obtain a physical digital copy with no restrictions. Not even DRM restrictions. They say, well, we would of course put on DRM. But they want an unrestricted license with no terms whatsoever. It is for the copyright owner to determine the terms. The digital economy as it exists now exists because of the terms put on digital work. They are unique work. They can be distributed around the world. So the answer is the license they wanted to get was open and your client was not willing to enter into a license like that. And the fact that two parties could not have a meeting of the minds on a license as was found in 2DI does not change this analysis. Getting to the issue that you were just talking about, not only the ASTM case, but just Menashe's question about the first and fourth factor. The less transformative the product is, the less likely it would... The more transformative, the less likely it would impact the market, correct? So there is a correlation between the first and the fourth factor. Oh, absolutely. The courts repeatedly recognize that there's an interplay between the first and the fourth factor. And that when you have a situation like here where something is utterly non-transformative and it clearly acts as a direct substitute, then the fourth factor tilts dramatically toward or it should be decided to favor the plaintiff. What about the evidence that certainly the district court cited to it, admissions or undisputed evidence in the 56th statement about pitching CDL or pitching joining the open library project as a way to save money? Are you relying on that at all? Oh, absolutely, Your Honor. It's very rare in a record that you have actual admitted evidence that shows that a party is intending to supplant your market. And that's what we have in this record. The Internet Archive on this appeal tries to dismiss this as rhetorical flourishes. These pitches were made to hundreds of libraries and hundreds of slide desks provided to libraries with this exact same pitch. You don't have to buy it again. There is only one way to read that. They are instructing them, join open library project, you can get the free digital books from us, and you do not have to pay the going price of the license fee. They have did that over and over again. And Your Honor also raised the five-year rule, which is another admission of the fact that this is a supplant. They say this is a policy, but as you properly noted, in their appeal brief, they admit that this policy is implemented because they recognize that a vast majority of books are sold in the first year or two. But what they are trying to do is basically change the copyright law again so that there is a five-year limitation on copyright. So they are actually not trying to make money off of it and they don't really want to interfere with your copyright but they have this purpose to expand access to the works as much as possible without interfering with the copyright holder's profits from it. It seems like it should be a point in their favor that they are trying not to undermine the profits of the copyright holder, right? Well, a couple of points on that. First of all, the Supreme Court and Harper and Rode made it clear that every copyright infringer can make an argument that they are expanding access to a work and that is not sufficient to change the equation. But also, Your Honor, with regard to, again, the non-profit status of Internet Archive, it has to be considered, as Campbell made clear, on a continuum where you are weighing the transformative use against commerciality or non-profit status. But I want to... Let me push that though because, so, does your position rest in significant part on the District Court's non-profit analysis so if we conclude that that's off then your case is significantly weakened? Absolutely not, Your Honor. That is not our position. If this Court were to find that Internet Archive's actions were entirely non-commercial and I think that's... There's a lot in the record that puts that into question but let me set that aside right now and make clear. If this Court were to conclude that Internet Archive's actions are entirely non-commercial, given the utter loss of transformativeness and a clear substitute effect, the first factor still weighs strongly in favor of the publishers. So our position on fair use generally and the first factor specifically does not turn or change on how this Court adopts the non-profit issue. But let me focus for one moment on just a little bit of the evidence here on the commerciality of Internet Archive. Unlike most libraries, Internet Archive is owned by an individual,  who has funded this and he, that booster tail, as you well know, and virtually every page of the Internet Archive has a button that says you can buy this on Better World Books, which is giving an incredible amount of PR and certain revenue that drives between them. In order to... The revenue they've gotten the whole time is like $5,000? Well, the whole time is just... It was like a year and a half that we're talking about,  But that just goes to the fact of what the observation in Ringel that books are unique is that generally, not always, but generally, when you read the book once you don't need to read it again or buy it. And they're offering it free. So that doesn't... That doesn't speak to the fact... So you're suggesting that once they read the digital version there's no reason for them to click on the link and buy a physical copy, right? But it's still giving infinite PR promotion to a commercial entity that is... So they own the book and they see a link for Better World Books and they go buy other books. That's the argument that it just kind of drives traffic to the Better World Books site but it's not really about... They won't profit from the sales of that book because once somebody reads the digital copy they don't want a physical copy? That's your argument? Well, in my experience most public libraries do not have links to commercial sister corporations on their site. And that makes Internet Archive unique. In addition to the fact that Brewster Kahle made it clear when he was acquiring Better World Books that the past two millions of books was, and the quote is, arm and arm with Better World Books. They are arm and arm with a for-profit entity. That is a distinct element that hits you. But I want to underscore you're fine... Your opponents cite to the Texaco case for support that the fact that they're a non-profit organization makes a difference. And I looked at Texaco and it seemed to me that in Texaco it was the flip side, right? The district court said, hey, you're a for-profit corporation therefore factor one weighs against you and that the Second Circuit said, well, you know, that doesn't entirely determine the issue of factor one, whether it's transformative or not. Can you respond to their argument on Texaco? Yes, Your Honor. With Texaco, it was looking at whether there were incidental benefits that ultimately were giving commercial advantage to Texaco. And what was critical in the Texaco case is that this was a systematic use. That was a great concern for the Second Circuit. Here we are dealing with a systematic use with a putative, I mean, it is a non-profit, but with a non-profit with a lot of commercial elements. But that doesn't, it comes back to the continuum point I was making, Your Honor. If you, all of this on the first factor, commerciality does not create a first factor finding against the defendant necessarily, if their use is highly transformative. And your position is we can decide the first factor without even reaching the commerciality. Correct. The commerciality. This is so utterly transformative and so utterly substantive. I'm sorry? It's utterly derivative, is your position. Exactly. It's a derivative work. And it's doing nothing but repackaging and repurposing the derivative work. I want to also, because I talked about licenses, there's two elements of market harm that is established here. And, you know, as I've indicated, the lost licensing fees exist. And they're undisputed. There's no expert testimony contrary. Neither of their experts address the lost licensing fees. The only argument that Internet Archive has made in response to this, and honestly, I think it's mere sophistry, is that they say that they don't harm the market. There is no market in controlled digital lending. But, of course, there's no market in controlled digital lending. Controlled digital lending is predicated on infringement and the nonpayment of any fees. And I also want to underscore that the publishers do not have to show a reduction in license fees for the fourth factor to weigh decidedly in our favor. That very point was rejected by this court in Ringel. I don't know what your reaction is to the colloquy I had with Mr. Gratz about the interplay between the arguments on the fourth factor and the first one, that on the first factor, they're arguing that it's transformative only looking at what they do to the physical book, but that the fourth factor is that the market harmed for the market for physical books and e-books. Is that a problem for him because he's being inconsistent or is it a problem for you because it suggests that we might be able to discount the market for e-books because we're really focused on the comparison of physical books? I think you can't divorce them. First of all, the law tells you to weigh the two factors together. That is the critical analysis. But I think that what you find with the Internet Archive's position in this case is they often talk out of both sides of their mouth. They underscore and try to, you know, piggyback on the TVI's utility observation by emphasizing the great efficiencies that are allowed and given through the e-books and that transformation. But those are the very efficiencies like you can get them to rural people easier, disabled people. But those are the precise same efficiencies that are being served by the publishers here. They are simply usurping those efficiencies. I think it's not really in question that if the comparator on the transformative issue were between the digital book and the e-book that it really wouldn't be transformative because it is just a different version of the digital book. But he's saying, well, we have a right to use our physical copy and this is a transformative use of the physical copy. Is that the right way to think about it or are you suggesting that actually the book is something more than the physical copy and so when we think about the CDL version of the book we should compare it both to the physical copy and to the e-book because those are both versions of the book that the publisher produces. They are not distributing the physical copy, Your Honor. That's the whole point to control digital lending. That is not the right way to think about it. They are taking the physical copy and transforming it into a new and different format with different capabilities that has a different market. They are not just using the physical copy. They create that argument out of their... No, I get that. But when I'm deciding    whether this is a transformative use of a copyrighted work, am I thinking about whether it's a transformative use of the physical copy that the owner has purchased or is the book something larger than that and I'm supposed to think about whether it's a fair use of the book as instantiated in any product that the publisher produces that distributes that work which would include the physical copy as well as the e-book. That's my question. What you look at according to Warhol is the purpose of the use and the purpose even if they're setting this out as physical copy when they've created this digital copy and they're distributing the digital copy which as you've noted is the... I know, but you make this argument that actually it's the same purpose as the physical book. But even if we agreed that it was a different purpose to make it more convenient or accessible or whatever, that is the purpose of the e-book and so I'm just asking does that factor into the transformative, the first factor analysis or not? It sounds like you actually are kind of buying into the idea that if we are comparing the CDL version to the physical copy and the e-book only comes into play when we're doing the fourth factor. Is that right? No, no, I'm not buying that at all, Your Honor. I think because the first factor is looking at the... You look at not just the purpose but does this act as a substitute and via this transformation they're not as I say again they are not distributing physical books. They cannot rely on physical books as the basis here. They are transforming these physical books into e-books and that is what they are distributing. Well, it's not transformative, right? No, no, you think that's what I'm saying. That's actually that very point that's been made by this court that you transform a book when you create or a work when you create it into a new format but that is not the type of transformativeness that the first factor looks at. You're converting it to a derivative form not a transformative form. Correct. And I believe in the discussion of Redigi that you know you were emphasizing about I think appropriately that that was a similar fact pattern where the defendant there had instituted a system where they were trying to maintain that this was one-to-one and largely the same but Redigi was dealing with what we would submit a similar contrived construct in order to make an argument or some you know some defense of what they were doing in the same way controlled digital lending is a contrived construct that was put together at the behest of Internet Archive back in 2018 when they confronted the fact that libraries didn't want to deal with them. Libraries didn't want to give copies of their works to be digitized because they were concerned about copyright arguments. So they got in the room together with various people and contrived this principle of controlled digital lending to rationalize what they were doing. But the question... That's what fair use is, right? Like people get together and decide like can we use this to this extent? What are the limits of how the fair use factors would be applied? I mean it's not nefarious to sit down and decide whether you're proposing to do something that's covered by fair use or not, right? Correct. And I want... You're absolutely correct and I want to get to a point that you were alluding to about the question of fact and I think I've answered that with saying there's no question of fact or expert testimony on the licensing substitution which under TVI's and Ringgold and other cases is sufficient. But even if you get to the substitute effect and the impact on our customer sales, there also is no question of fact here. There... It is undisputed in this record that... And you heard it today and you indicated it that not only nine public libraries have signed on to their open libraries project but there are 9,000 public library systems in this country. If even half of those chose to change their practices, if this court were given the green light to the actions of Internet Archive and even half of them didn't purchase licensed books or licensed e-books, it would eviscerate the library market and it would have a dramatic impact on the consumer market as a whole.         Because you cannot compete with free. That is... You don't need... Library market and impact the consumer market, you're talking about the market for e-books? Yes. Would it have an interference with the market for physical books? I think it would but I think their own expert, they tried to rely on their expert, Meemers, but she was the first to recognize that these are distinct markets and you can't really look at lost print books in order to evaluate the impact on the market with e-books because they're distinct markets. We think it would probably have an impact eventually if this became so widespread and so unrestricted. They offered a standard. It would have an effect on print books as well. But what is before your honors are the markets in the library e-book market as well as the consumer e-book market and there can be little question that the impact would be dramatic, swift, and devastating. Let me ask you a slightly different question. You distinguished the ASTM case earlier because that's the case involving the publication of industry standards that then is adopted by the federal government as part of the regulation and I understand that distinction. They were already law and so they weren't putting anything out there digitally that wasn't already available. And I think in that case because they were putting something out there that was already adopted into  factors 1, 2, and 3 weighed heavily in favor of fair use. And the court it seems to me said when it came to the fourth factor it was equivocal and still ruled in favor of fair use. Here, if factors 1, 2, and 3 were to be found in favor of the publishers and this court were uncertain as to the fourth factor. Is it necessary for the fourth factor to be in the  favor in order to for the publishers to succeed or for an affirmance? Well, first of all, there's a wealth of evidence that establishes the fourth factor clearly. I'm not suggesting the response. It's a hypothetical. Okay. Okay. Well, it's a numbers game. Three factors unequivocally favor the plaintiff and the fourth factor is at best equivocal. And I would  strenuously that it is not equivocal. But if the fourth factor was at best equivocal, then it still would decidedly be this court should affirm and it's decidedly waived in the publisher's  Because your opponents, both sides stipulated there were no disputed facts. Both sides moved for summary judgment. But your opponents in one of their briefs said, but if the court is inclined to buy into this     fact. And so that's what I'm trying to get at and wondering if you want to respond. Well, I think that there was a vast majority of undisputed facts. I don't think that there was a stipulation in the rectus that all facts are undisputed. I'm sure that Mr. Gratz would agree with me on that. But the vast majority and the key facts that drive the decision are undisputed including the facts on the fourth factor. But turning also to the facts of ASTM, which you were referencing your Honor, it's important to note there that there were two cases in the 23rd, 2023 case of ASTM. It found that the fourth factor still was not working for the defendant. In part because the evidence showed that what had been incorporated into law was not necessarily the current best practices. The law was a little slow to capture what best practices and standards were. So there was still a market to purchase the new developing standards. There was found to be a significant market that existed that would be impacted here. And then again, I want to underscore with ASTM, it was not found to be fair use when the standards had not been enacted into law. We don't have anything remotely comparable here. So I would like in closing, Your Honor, because I think my time is up, that I just want to touch on because it hasn't been addressed too much, that I briefed and amici tried to create the impression that the public interest is on their side. And it is not. The protection of copyright is in the U.S. Constitution and federal law because it creates an incentive for writers and artists to create new words to benefit our broader society. Internet archives control digital lending is in direct conflict with that basic principle. And as I previously said,  think people are going to stop writing books because of  control of digital lending. I think publishers are going to go down the  I think there is no question. The standard here is not will this eliminate the digital  This question about balancing the incentive to create a work is the question to be decided in this case. It is not your argument. Thank you. This court recognized that any secondary use that competes as an effective substitute impedes the purpose of copyright, which is the incentive to create new works by enabling the creator to profit from them. For all the reasons set forth in our briefs, Your Honor, for this record, and what has been said today, we strongly urge the court to affirm the decision below. Thank you. Thank you very much. We will turn back to Mr. Graf. I would like to begin where we left off in Ms. McNamara's closing, which is the question of  Copyright should not grant anyone more economic power than is necessary to achieve the incentive to create. Judge Graf,  comment is that nobody is going to not write a book or publish a book because of CDL. That is exactly right, and that is why the fourth factor does not weigh against this use. I would suggest that Ms. McNamara should  write       That is exactly right, and that is why the fourth factor does not weigh against this use. I would suggest that the          we have shown that it does not with our data.  you are  the market from the number of people who might want to read it  down to the number of people who might want to read it simultaneously. If you put digital books into the mix, it is the same idea. It is not a free-for-all. You have a restriction on it, but the restriction by design saves a lot of libraries and libraries can buy books and lend them. That is  happening here, except it is happening in a more efficient and               digital way. It may or may  have an effect on the number of copies sold, or on the market for the overdrive service, which has a variety of different aspects and benefits over and above CDL. CDL is largely scanned images, pages of paper books. The overdrive service has a lot of benefits. That is one reason why that is one explanation for. The data you see, there is no reduction in demand for overdrive. That is right. This is a point I want to dig  into a little bit. The data in Dr. Jorgensen's analysis is the question of what would happen if there effectively were not any meaningful caps on the concurrent number of  What would happen to the market for overdrive in that circumstance? That is the hypothetical posed by the question.      levels? What Dr. Jorgensen's analysis shows is even in that circumstance, it does not affect the market for overdrive funding. There are a variety of possible reasons for that. One of them is look, if they can lend their existing physical collections, they can lend physically now in that more efficient way. That is why we think that is the comparator. There was a conversation during the argument about what is the comparator? What do you compare to? And  you compare to what we could do already. You compare to lending your physical collections. The struggle I'm having with your response to these questions is on the one hand, you want to say this is transformative because it is efficient and we can get people to read more books faster and they  can    That efficiency has absolutely no impact on whether the publishers can sell the e-books or the hard copies. It sounds wonderful when you are saying it, but when I step back and listen, I am having trouble reconciling those two. One point that may be helpful here in reconciling the two is digital technology is sort of beneficial to society and it has come along and it made some things more efficient. What the publishers are saying is we get to keep all that benefit and we get to decide who gets to use the digital technology and how. We get to set the rules. We can photocopy books. The technology allowed books to be photocopied. That doesn't mean that someone has the right to buy a book and make 100 copies of it and make it available. Yes, technology creates efficiency, but that efficiency could also violate copyright. What about my hypothetical? Does that mean when copiers came out and books weren't printed in the same way or manuscripts now could be copied? Forget the preservation issue of  the exception for that. I think the answer is the big series of libraries of the 1970s were about photocopying. They decided where the line was taking all of the publishers and the libraries and they didn't decide libraries can't have photocopies in them and they didn't decide libraries can't make extra copies. They did decide that  can't make extra copies of their books. But even if they had a one-to-one, so if the library makes a Xerox copy of a book and says I want to preserve the original copy so I'm going to keep that in storage and circulate the Xerox copy, that would violate the physical copy of the book. In that hypo, you don't get the increase in efficiency and convenience that this court has said. You've been saying all along all we're doing is exactly what a library would be doing. But actually a physical library cannot make a physical copy of a book and circulate it in place of the original copy. It can't do that. So if it can't do that, you're not doing just what a library is  So your  actually depends on the digital copy being transformative and the physical copy not being transformative. That's the thing that makes the difference, not the one-to-one ratio. Whether it would be taking everything into account for a library to make a copy of a book that was fragile or something and put the original in storage and circulate the photocopy, I think that is a case that would need to be decided on its own side. It would not involve what Sony and TV eyes and what ReDigi talking about them involved, which is an increase in efficiency that comes from the  increase in efficiency. I just want to return to a couple of other items. I think that is                              TV are in a better position than the defendants in the ASTM case were. In that case, there was an absence of data. The plaintiff had not come forward after a long time to show any harm or any data reason there would be.    data showing that the market that she is talking about, that is, the market for the licensing of this to  would not be affected by what we are doing, even were it to become widespread for the reason that I was discussing with Mr. Robinson, that is, what was happening during the period that Dr. Jorgensen analyzed was analogous to a situation where this practice became widespread. Thank you very much, Mr. Gratz. The case is submitted.